UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 1:18-mj-00020-JCN |
| v. ) | |
| ) | 21 U.S.C. § 841(a)(1), 841(b)(1)(C), |
| JAMES COX ) | 331(i)(3), and 333(b)(8) |

## CRIMINAL COMPLAINT

I, Robert Ekey, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### COUNT 1
### (Distribution of Furanyl Fentanyl)

On about October 12, 2017, in the District of Maine, defendant

### JAMES COX

knowingly and intentionally distributed a mixture or substance containing furanyl fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

It is further alleged that the penalty provisions of Title 21, United States Code, Section 841(b)(1)(C) apply to the conduct described herein.

### COUNT 2
### (Distribution Furanyl Fentanyl)

On about October 26, 2017, in the District of Maine, defendant

### JAMES COX

knowingly and intentionally distributed a mixture or substance containing furanyl fentanyl, in violation of Title 21, United States Code, Section 841(a)(1).

It is further alleged that the penalty provisions of Title 21, United States Code, Section 841(b)(1)(C) apply to the conduct described herein.

## COUNT 3
### (Distribution of a Counterfeit Drug)

On about February 3, 2018, in the District of Maine, defendant

**JAMES COX**

knowingly and intentionally sold and dispensed a counterfeit drug, in violation of Title 21, United States Code, Section 333(i)(3).

It is further alleged that the penalty provisions of Title 21, United States Code, Section 333(b)(8) apply to the conduct described herein.

This Complaint is based on those facts which are set forth in my affidavit of February 5, 2018, which is attached hereto and incorporated herein by reference.

_____
Robert E. Ekey
Special Agent
Food and Drug Administration, Office of Criminal Investigations


Sworn to before me and subscribed in my presence this 5th day of February, 2018.

_____
John C. Nivison
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES COX | Docket No. 1:18-mj-00020 -JCN |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLANT

I, Robert E. Ekey, being duly sworn, declare and state:

I am a Special Agent with the Food and Drug Administration, Office of Criminal Investigations (FDA OCI), assigned to the Boston Resident Office in Wakefield, Massachusetts. As such, I am authorized to conduct criminal investigations, make arrests, and execute search and arrest warrants for offenses in violation of the federal Food, Drug and Cosmetic Act (FDCA), Title 21, United States Code, Sections 301-395 and related violations of Title 18 of the United States Code and related violations of Title 18 and Title 21 of the United States Code. I have been a federal law enforcement officer since 1998. Prior to joining FDC OCI, I was employed as a Special Agent with the Department of Housing and Urban Development, Office of Inspector General and the Treasury Inspector General for Tax Administration, and as an Inspector with the Internal Revenue Service (IRS), Inspection Service. I have been a Special Agent with FDA OCI for over eight years. I have completed the Special Agent Training Program at the Federal Law Enforcement Training Center, IRS Inspector Basic Training Program, FDA OCI Special Agent Training Program and the FDA OCI Food and Drug Law Training Program, which covered various legal aspects of criminal enforcement of the FDCA related to the sales of misbranded and adulterated drugs. I have been the affiant on numerous search and arrest warrants and have conducted numerous investigations regarding violations of

1

Titles 18 and 21 of the United States Code. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from agents with the Maine Drug Enforcement Agency, and other witnesses. I make this affidavit in support of a criminal complaint charging James Cox with the two counts of distribution of furanyl fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), and one count of distribution of a counterfeit drug, in violation of Title 21, United States Code, Section 331(i)(3).

## COUNT 1

1.   On Thursday, October 12, 2017, a Cooperating Individual (hereinafter "CI")[1] stated that he/she could contact a person known to the CI as James Cox and coordinate the purchase of six (6) 30 milligram Percocet pills for $200.00. Law enforcement officers were familiar with Cox and instructed the CI to make preliminary arrangements for a transaction later that day.

2.   At approximately 4:25 p.m., Maine Drug Enforcement Agency Special Agent Shane Campbell and other law enforcement officers met with the CI at a location in Bar Harbor, Maine. During the meeting, the CI disclosed that he/she had set up a meeting with Cox at the Hannaford in Ellsworth, Maine, between 5:00 p.m. and 6:00 p.m. to complete the transaction. The phone call referenced by the CI was not monitored or recorded. However, S/A Campbell reviewed a text message communication sent by the phone number identified by the CI as used by Cox to the CI at 12:47 p.m. that day stating "Got blue paint." The CI informed S/A Campbell that Cox's text message meant that Cox had blue Percocet pills.

---

[1] The CI has a pending criminal charge in the Maine Unified Criminal Docket and is looking for consideration. No promises were made to the CI with respect to the outcome of his/her pending case, but he/she was told that his/her cooperation would forwarded to the prosecuting attorney responsible for the pending matter.

2

3.  At approximately 6:00 p.m., agents with MDEA met with the CI and conducted a thorough search of the CI and located no drugs, weapons, or money. The CI was then provided $200.00 in prerecorded MDEA buy money to purchase the pills from Cox and was also fitted with an electronic transmitting device ("ETD") that would be used to monitor the transaction between the CI and Cox.

4.  Between 6:30 p.m. and 9:00 p.m., the CI and Cox engaged in multiple conversations that were monitored by law enforcement officers. Cox and the CI ultimately agreed to meet at the Wal-Mart parking lot in Trenton, Maine.

5.  Agents followed the CI to the Wal-Mart parking lot. Once there, S/A Campbell observed the CI approach a silver Ford F150 (hereinafter "the Target Vehicle").[2] While monitoring the ETD S/A Campbell listened and heard the following:

    i.  Cox explained that he was charging the CI $35.00 per pill and that he had sold them at the "track" for $30.00. (Prior to the transaction S/A Campbell had information that Cox had just returned from a NASCAR race in New Hampshire.)

    ii. Cox commented that he had two more stops to make and that he would be around all weekend.

    iii. The CI confirmed that Cox provided him with six (6) pills.

    iv. The CI verified that it would be $200 for the six (6) pills.

    v.  Cox multiplied six times $35.00 aloud and then subsequently told the CI that he/she owed him $10.00.

    vi. Cox stated that he had nothing to put the pills in.

---

[2] I learned that S/A Campbell had previously received information from the CI that James Cox owns and operates a silver Ford F150. The vehicle that the CI approached was a silver Ford F150 and after S/A Campbell queried DMV records for Maine Commercial registration of SUNYRCN, he learned that James Cox (DOB 03/19/1964) is the registered owner of that vehicle.

3

6. Following the transaction, the CI returned directly to S/A Campbell's vehicle. The CI provided the six (6) blue pills to S/A Campbell. During a subsequent search of the CI, no weapons, drugs, or money was found.

7. S/A Campbell transferred the six (6) blue pills to S/A Smith who used the markings on the pills to identify them as 30mg Oxycodone based on a query run by Maine Poison Control.

8. I learned that on October 16, 2017, S/A Campbell and S/A Frost conducted a field test of the blue pills using a Thermo Scientific TruNarc scan to analyze the blue pill substance. Each pill was scanned and returned a result of inconclusive.

9. Based on the absence of Oxycodone in the testing, I know that based on my training and experience these pills are likely counterfeit. An inconclusive result could be caused by the presence of impurities and/or cutting agents or a combination of these reasons

10. After performing the TruNarc Scan on each of the pills, they were placed in a heat sealed bag and submitted to the Maine Health and Environmental Testing Laboratory ("HETL") for chemical analysis. On November 1, 2017, a chemist from the Maine HETL lab provided a certified analysis that three (3) of the six pills tested indicated that each of the three pills tested were found to contain methoxyacetyl fentanyl and furanyl fentanyl. I know based on my training and experience that fentanyl, and fentanyl analogs such as furanyl fentanyl, are becoming increasingly more common in the production of counterfeit drugs. I also know based on my training and experience that methoxyacetyl fentanyl and furanyl fentanyl are not found in legitimate oxycodone pills.

## COUNT 2

11.     Following the transaction on October 12, 2017, agents directed the CI to make arrangements with Cox for a second controlled purchase.

12.     On October 26, 2017, the CI informed S/A Campbell that he/she had arranged to meet with Cox at the Wal-Mart in Ellsworth, Maine. The CI informed S/A Campbell that Cox reminded the CI that he/she owed Cox $10.00 from the controlled purchase on October 12, 2017.

13.     At approximately 6:00 p.m., S/A Campbell met with the CI at a location in Bar Harbor, Maine, and reviewed text message communications between the CI and Cox. While photographing the text messages between the CI and Cox, S/A Campbell learned from the CI that Cox had a new phone number. The CI identified this number as (207) 460-2017. According to the CI, he/she communicated with Cox over (207) 460-2017 earlier in the day to arrange the transaction.

14.     S/A Campbell then performed a search of the CI and did not find any drugs, weapons, or money. The CI was then provided with $220 of prerecorded MDEA buy money and outfitted with an ETD in order to monitor the transaction between Cox and the CI.

15.     At 6:20 p.m., S/A Campbell parked the CI's vehicle in front of Wal-Mart and then walked into Wal-Mart to wait for the transaction to occur. The CI remained in the car and Agents maintained constant visual surveillance of the car. Soon thereafter, agents observed the Target Vehicle park in front of the gardening section at Wal-Mart. Agents observed the CI walk to the Target Vehicle and then get inside.

16.     Although not able to see the transaction as it was being conducted inside Cox's vehicle, agents were able to monitor the transaction via the ETD real time.

17. At 6:36 p.m., the CI sent a text message to S/A Campbell stating, "All good." S/A Campbell then met with the CI in the CI's vehicle where the CI provided S/A Campbell a plastic bag containing six (6) blue pills. The CI was subsequently searched and no drugs, weapons, or money were located.

18. S/A Campbell subsequently listened to the recording of the transaction and heard the following:

   i. Cox reminded the CI that she/he owed Cox the $10.00 from the previous buy.

   ii. The CI asked Cox if these "Percs were regular" pills and if the pills were not real bad. Cox responded that he did one of the pills earlier in the day and they were fine.

   iii. The CI verified that there were six pills and Cox agreed that the price was $220.00

   iv. The CI then counted out the pills and Cox again stated that he did one of the pills before he left to come to the buy.

   v. The CI then asked Cox about getting a better deal on buying the pills. Cox stated that if the CI were to purchase twenty (20) pills, the price would go down to $32.00 per pill. Cox then said if the CI purchased 30 pills then he would go down to $30.00 per pill.

19. S/A Campbell transferred the six (6) blue pills to S/A Christopher Smith. S/A Smith used the markings on the pills to identify them as 30mg Oxycodone based on a query run through the Ident-A-Drug internet based searchable database.

20. I learned that on October 30, 2017, S/A Smith conducted a field test on one of the blue pills using a Thermo Scientific TruNarc scan to analyze the blue pill substance. The

scan retuned a result of inconclusive and did not show the presence of Oxycodone. Based on the absence of Oxycodone in the testing, I know that based on my training and experience these pills are likely counterfeit. An inconclusive result could be caused by the presence of impurities and/or cutting agents or a combination of these reasons.

21.     After performing the TruNarc Scan on each of the pills, they were placed in a heat sealed bag and submitted to the Maine HETL chemist for chemical analysis. On November 11, 2017, a Chemist from the Maine HETL lab provided a certified analysis that three (3) of the six pills tested indicated that each of the three pills tested was found to contain methoxyacetyl fentanyl and furanyl fentanyl.

## COUNT 3

22.     On February 3, 2018, the CI received a text message from (207) 949-3432, which had previously been identified by the CI as Cox's new number and was listed as "Jamie C" under the CI's contact list. The conversation went as follows:

**02/03/2018**

12:21 p.m. – Cox to CI – Paint at 6 !!

4:03 p.m. – Cox to CI – You want gallons ??

4:03 p.m. – Cox to CI – Need to know …..

4:03 p.m. – CI to Cox – Did you get?

4:03 p.m. – Cox to CI - Yup !  How many gallons  ??

23.     The CI told me that these messages relate to the purchase and sale of 30mg Oxycodone pills.

24. After a series of additional phone calls and text messages, Cox and the CI agreed to meet at the Wal-Mart in Ellsworth, Maine. The CI informed Cox that he would be leaving for Wal-Mart at 6:20 p.m.

25. Agents conducting routine surveillance at 22 Tufts Court, Surry, Maine, (hereinafter "the Target Residence") which is the residence of Person A observed the Target Vehicle parked in the driveway.[3] Additionally, agents have seen the Target Vehicle present at the Target Residence during overnight hours consistent with long residency. Based on this information, agents set up surveillance at this location. At approximately 6:15 p.m. Agents observed Cox leave the Target Residence, enter the Target Vehicle and turn it on, and then return to the Target Residence. At approximately 6:20 p.m., agents observed the Target Vehicle leave the property and drive to Ellsworth Car Wash where agents observed Cox fill propane tanks. Agents continued their visual surveillance of Cox from Ellsworth Car Wash to the Ellsworth Wal-Mart.

26. Prior to their arrival at Wal-Mart, S/A Campbell performed a search of the CI and did not find any drugs, weapons, or money. The CI was then provided with $210.00 of prerecorded MDEA buy money and outfitted with an ETD in order to monitor the transaction between Cox and the CI.

---

[3] On November 15, 2017, Person A was arrested by Maine State Police with trafficking in Schedule W Drugs when officers recovered approximately 480 blue pills (consistent with the appearance of 30 mg, Oxycodone) and more than 25 grams of Ecstasy, eight (8) five (5) gallon buckets of dried marijuana, seventy-nine (79) doses of Subutex, and other pills believed to be MDMA, from a storage unit in Blue Hill, Maine where Person A placed his property. After recovering the suspected controlled substances, S/A Christopher Smith tested multiple blue pills using the Thermo Scientific TruNarc Analyzer. Each of the pills tested showed a result for Cellulose. S/A Smith identified the blue pills by their markings. On each of the blue pills there was an "A" on one side and a "215" on the other. According to the Ident-A Drug online searchable database the pills should have been 30mg Oxycodone. As a result of Person A's arrest he was placed on bail conditions that include random search and testing of his residence.

8

27. At approximately 6:45 p.m., S/A Campbell drove with the CI to the Wal-Mart parking lot where he then exited the CI's vehicle and walked to the entrance of Wal-Mart so that he could continue with visual surveillance.

28. At approximately 6:55 p.m. agents observed a silver Ford F150 park a few spaces away from the CI's vehicle in the Wal-Mart parking lot. This was the Target Vehicle.

29. Soon after Cox arrived in the parking lot, agents observed the CI leave his/her vehicle and enter the passenger side of the Target Vehicle. Although agents were not able to see the exchange of drugs and money between the Cox and the CI, agents were able to monitor the transaction via the ETD. While monitoring the transaction, agents could hear the following conversation between Cox and the CI:

   i. Cox discussed the number of pills the CI was purchasing;

   ii. Cox informed the CI that he was charging the CI $35.00 per pill and that the total for the six (6) pills was $210.00.

   iii. Conversation that Agents believe are consistent with the exchange of money and pills between the CI and Cox.

30. At approximately 7:05 p.m. the CI exited the Target Vehicle and returned to his/her own vehicle. After watching Cox leave the Wal-Mart parking lot, S/A Campbell returned to the CI's vehicle where the CI provided him with six (6) blue pills with a mark of "A" on one side and "215" on the other, indicating the pills were 30mg Oxycodone based on a query run through the Ident-A-Drug internet based searchable database. S/A Campbell searched the CI again and did not find any drugs, weapons, or money.

31. I learned that on February 4, 2018, S/A Campbell conducted a field test on one of the blue pills using a Thermo Scientific TruNarc scan to analyze the blue pill substance. The

scan retuned a result of Cellulose. I know that based on my training and experience that results indicating the presence of Cellulose and not indicating the presence of Oxycodone is indicative of counterfeit pills.

32. After leaving the Wal-Mart parking lot, agents maintained visual surveillance on Cox until he returned to 22 Tufts Court, Surry, Maine, which is the residence of Person A. At this time surveillance was terminated.

33. Based on the above, I respectfully request that the Court issue a criminal complaint charging James Cox with the offenses of distribution of controlled substances, namely furanyl fentanyl, in violation of Title 21, United States Code, Section 841(a)(1); and selling and dispensing a counterfeit drug, in violation of Title 21, United States Code, Section 333(i)(3).

Robert E. Ekey
Special Agent
Food and Drug Administration, Office of Criminal Investigations


Sworn to before me this 5th day of February, 2018.

John C. Nivison
United States Magistrate Judge